UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JAMES D. WILLIAMS

No. 18 CR 339

Judge John Robert Blakey

## GOVERNMENT'S SUPPLEMENTAL MOTION *IN LIMINE*

The government respectfully submits the following supplemental motion *in limine* pursuant Federal Rule of Evidence 801(d)(2)(E) to admit against Williams co-conspirator statements made by Alexis Handelman and Jessica Sweeney Williams ("Sweeney").[1]

---

[1] The government filed its original motions *in limine* on June 10, 2019, on which the Court ruled on September 9, 2019. (Dkt Nos. 91, 110.)

The government has conferred with counsel for Williams concerning the instant motion *in limine*, who have represented that Williams: (1) opposes the introduction of Sweeney's statements; and (2) does not oppose the introduction of Handelman's statements, so long as she testifies at trial. The government intends to call Handelman at trial but, even if she does not testify, for the reasons discussed below, her statements are admissible against Williams as coconspirator statements.

Counsel for Williams have again (*see* dkt. no. 91 at 3) represented to the government that Williams does not object to the following motions *in limine*: (1) to admit evidence of Williams' prior felony convictions within the last 10 years, should Williams testify; (2) to prohibit discovery requests or commentary concerning discovery in the presence of the jury; (3) to preclude argument defining reasonable doubt; and (4) to preclude arguments or evidence intended to elicit jury nullification, including evidence or argument related to Williams' potential punishment, except that Williams may question Handelman concerning the fact that she was not charged with a violation of Title 18, United States Code, Section 924(c) and the ramifications thereof. Based on defense counsels' representations, the government has not included these motions *in limine* within this filing.

1

## I.   BACKGROUND

### A.   Third Superseding Indictment

The third superseding indictment (Dkt. No. 124) charges Williams with:

(1) Conspiring with Handelman to rob three banks in the Northern District of Illinois, in violation of Title 18, United States Code, Section 371 (Count One);

(2) Robbing the Old Second National Bank, the Norstates Bank, and the Aurora Bank & Trust, in violation of Title 18, United States Code, Section 2113(a) (Counts Two, Four, and Six);

(3) Using an AK-47 style rifle during the Old Second National Bank and Norstates Bank robberies, in violation of Title 18, United States Code, Section 924(c) (Counts Three and Five);

(4) Discharging a .45 caliber pistol during the Aurora Bank & Trust robbery, in violation of Title 18, United States Code, Section 924(c) (Count Seven);

(5) Possessing a .45 caliber pistol after sustaining a conviction for an offense punishable by more than one year in prison, in violation of Title 18, United States Code, Section 922(g) (Count Eight); and

(6) Conspiring with Sweeney to dispose of a firearm and ammunition to a person who had been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of Title 18, United States Code, Section 371 (Count Nine).[2]

---

[2] The third superseding indictment also charges Sweeney with: (1) conspiring with Williams to dispose of firearms to a convicted felon (Count Nine); and (2) disposing of an AK-47 style rifle (Count Ten), rifle ammunition (Count Eleven), and a .45 caliber pistol (Count Twelve) to Williams, who is a felon, in violation of Title 18, United States Code, Section 922(d)(1).

### B. Factual Background

On February 22, 2018, Sweeney purchased a 7.62 x 39 caliber Zastava NPAP M40 rifle at the Gun Doctor, located in Roselle, Illinois. Williams accompanied her to the store to purchase the gun. Two days later, on February 24, 2018, Sweeney picked the AK-47 style rifle up from the gun store and, two days later, Williams took the below photograph of himself holding the rifle, which law enforcement found on his cellphone.[3]



---

[3] Images of Williams, in which his face is visible, wearing the exact same outfit as shown above were also recovered on Williams' cellphone. An example of such an image is below.



On May 1, 2018, Williams sent Sweeney a text message stating, "But I do need you to go back to Walmart and grab the right shells. 7.62 by 39. They are cheaper but I will give you this other box." Sweeney responded to Williams via text message, "Im thinking we need to invest in something a bit smaller," to which Williams stated, "Yes. Go get that box tho before it gets too late." Approximately two hours later, Sweeney purchased Winchester 7.62 x 39 mm ammunition at a Walmart located in Streamwood, Illinois.

On May 8, 2018, while at Sweeney's house, Williams sent her a text message stating, "Can I get a bean [gun] please? I'm about to move around." Sweeney responded, "Long as you promise to come see me later" and instructed Williams to look in the "Top drawer." Williams, thereafter, sent a text message to Sweeney stating, "I need to hit a bank." Sweeney responded, "Ok. Or notttttt. It ain't NEVER that serious. I need you to put the toy [gun] back. Please." A few minutes later, Sweeney texted Williams, "Btw [By the way]. They wont take the ammo [ammunition] back. Sed [Said] its final sale. Live ammo [ammunition]."

Between May 11 and May 31, 2018, Williams and Handelman robbed three banks in the Northern District of Illinois.[4] During each robbery, Williams carried the AK-47 style rifle he had obtained from Sweeney. On May 11, 2018, Williams and Handelman robbed the Old Second National Bank located in Ottawa, Illinois (the "Ottawa bank robbery"). Minutes before the robbery, Williams purchased latex gloves from an auto parts store down the street from the bank, at which store he left his

---

[4] On May 22, 2019, Handelman pleaded guilty to conspiring to commit bank robbery with Williams and robbing the three banks. (Dkt. Nos. 79, 80.)

fingerprint on a box of gloves. During the robbery, Williams pointed the loaded AK-47 style rifle at the tellers inside the bank. In the days following the robbery, Williams deposited $2,600 in cash into his bank account and rented a blue Nissan Rogue from Enterprise Rent-A-Car.

On May 21, 2018, Williams and Handelman robbed the Norstates Bank located in Gurnee, Illinois (the "Gurnee bank robbery"). Williams and Handelman drove to and from the bank in the rented Nissan Rogue. In preparation for the robbery, Williams replaced the rental car's license plates with license plates stolen from two different vehicles that were parked a short distance from the bank. Video surveillance from a local business captured Williams and his blue rental car in the area where the license plates were stolen. During the robbery, Williams used the AK-47 style rifle obtained from Sweeney to order tellers and others around the bank. Following the robbery, Williams deposited approximately $1,300 in cash into his bank account. On May 22, 2018, Williams returned the blue Nissan Rogue to the rental car company, replacing it with a black Ford Fusion.

A day after Williams robbed the Norstates bank, Williams accompanied Sweeney to Gat Guns where she purchased, with approximately $800 in cash, two pistols. Williams, thereafter, returned to the gun store with Sweeney on May 27, 2018, at which time they picked up the two guns Sweeney had purchased and they test fired them at a shooting range. A few days later, on May 31, 2018, Williams and Handelman robbed the Aurora Bank & Trust located in Aurora, Illinois (the "Aurora bank robbery"). Williams and Handelman used the rented Ford Fusion to get to and

from the robbery. During the robbery, Williams once again brandished the AK-47 style rifle he obtained from Sweeney. Williams also carried one of the pistols Sweeney had purchased on May 22, holding the gun to a bank teller's head and firing it into the ceiling of the bank. Williams deposited approximately $1,050 in cash into his bank account a few hours after the Aurora robbery.

Williams was arrested the evening of the Aurora bank robbery as he returned the rented black Ford Fusion to Enterprise Rent-A-Car. At the time of his arrest, Williams was in possession of nearly $8,900 in cash. While searching Williams' motel room following his arrest, law enforcement found a gun case containing a .45 caliber cartridge case that had been fired by the .45 caliber pistol purchased by Sweeney on May 22, 2018. The markings on the cartridge case match the markings on the fired .45 cartridge case recovered from the Aurora bank following the robbery. At the time of his arrest, law enforcement also recovered Williams' cellular telephone, which he used to communicate with Sweeney about the firearms and ammunition she gave him. Williams' cellular telephone also contained photographs related to the firearms and robberies, including the above photograph of Williams holding the AK-47 style rifle and the below photograph, taken shortly after the Ottawa bank robbery, of a table covered in stacks of cash.



Following Williams' arrest, Handelman traveled to her brother's home with the remaining money from the Aurora bank robbery. While at her brother's house, Handelman told her brother that she and Williams had robbed a bank, that Williams had been arrested, showed him the bank robbery money, and asked for his help in avoiding law enforcement. Before leaving, Handelman gave her brother $20,000 in bank robbery proceeds; $10,000 of which the government subsequently recovered.

After leaving her brother's house, Handelman subsequently traveled to Williams' uncle's home. Handelman gave Williams' uncle the majority of the bank robbery proceeds for safekeeping, who took possession of the majority of the bank robbery proceeds and later transported Handelman to his daughter's house in Normal, Illinois, where she stayed for at least one night.

## II.  **ARGUMENT**

The government seeks to admit, under Rules 104(a) and 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), the following co-conspirator statements against Williams at trial:[5]

---

[5] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c). Accordingly, statements by alleged co-conspirators may be admitted against a defendant, without establishing the *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987) factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that the defendant was out of cocaine was not hearsay because it was not offered for its truth but as evidence of membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) ("war stories" about the drug trade were not offered for the truth); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value in establishing knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set forth scope of the anticipated conspiratorial scheme).

(1)     Sweeney's statements to employees at the Gun Doctor, including that she wanted to purchase the AK-47 style rifle for home protection and that Williams was her husband;

(2)     Sweeney's statements to Williams, made via text message on May 1 and May 8, 2018, as follows:[6]

May 1, 2018
8:26 p.m. - 8:52 p.m.

**Williams:[7]**     But I do need you to go back to Walmart and grab the right shells before I take that trip

**Williams:**     7.62 by 39

**Williams:**     They are cheaper but I will give you this other box

---

[6] The marital confidential communications privilege does not apply to the instant communications because the statements were made in furtherance of a joint criminal enterprise. *See United States v. Darif*, 446 F.3d 701, 706 (7th Cir. 2006) ("We have recognized an exception to the privilege when spouses are joint participants in the underlying offense. We do not value criminal collusion between spouses, so any confidential statements made concerning a joint criminal enterprise are not protected by the privilege.")

In addition, although still legally married at the time of the communications, Williams and Sweeney were permanently separated, thereby rendering the marital privilege inapplicable. *See, e.g.*, *United States v. Fulk*, 816 F.2d 1202 (7th Cir. 1987) (exception to confidential marital communication privilege exists where couple is permanently separated at time of communication); *see also United States v. Byrd*, 750 F.2d 586, 590 (7th Cir. 1985) ("We refuse to extend the communications privilege to permanently separated couples on the theory that a guaranteed protection of confidentiality at this stage might save some troubled marriages. We, too, therefore, strictly interpret that portion of the privilege's requirement and hold that only communications that take place during a valid marriage between couples still cohabiting pursuant to that marriage are protected by the privilege."). At the time the instant communications were exchanged, Williams and Sweeney had been living apart for more than a year (in May 2018, Sweeney told law enforcement that she and Williams had been separated since May 2017 and that Williams had never lived at her current residence), Williams was living with Handelman and had been dating Handelman for at least two years, and Williams identified Sweeney as his ex-wife, including on the records Williams filled out when renting the cars at issue in this case.

[7] Williams' statements during these communications are, of course, admissible as admissions of a party-opponent. Fed. R. Evid. 801(d)(2)(A).

* * *

| | |
|---|---|
| **Sweeney:** | Im thinking we need to invest in something a bit smaller. |
| **Williams:** | Yes. Go get that box tho before it gets too late |

May 8, 2018
7:17 p.m. - 7:57 p.m.

| | |
|---|---|
| **Williams:** | Im laying in ur bed for a minute. I just needed a sec [second]. To be alone |
| **Sweeney:** | Ok bae |
| **Williams:** | Can I get a bean [gun] please? I'm about to move around |
| **Sweeney:** | Long as you promise to come see me later. |
| **Sweeney:** | You need some mommy hugs n love |
| **Williams:** | Ok bae. Where should I look |
| **Sweeney:** | Top drawer |
| **Williams:** | I need to hit [rob] a bank |
| **Sweeney:** | Ok |
| **Sweeney:** | Or nottttt |
| **Sweeney:** | It ain't NEVER that serious |
| **Sweeney:** | I need you to put the toy [gun] back. Please |
| **Sweeney:** | Hey |
| **Sweeney:** | Don't ignore me!! |
| **Williams:** | What's up |
| **Sweeney:** | You ok? |

| | |
|---|---|
| **Williams:** | Hell no! I will be though |
| **Sweeney:** | Its goin to be ok. |
| **Sweeney:** | Btw [By the way]. They wont take the ammo [ammunition] back. Sed [said] its final sale. Live ammo [ammunition]. |

(3)     Handelman's statements to Williams (made in-person) between May 10 and May 31, 2018, including:

- Handelman's statement to Williams before the Ottawa bank robbery that they (Williams and Handelman) should turn their cellular telephones off to avoid law enforcement detection; and

- Handelman's statements to Williams while they were looking for an individual to carjack prior to the Gurnee bank robbery, including that Handelman was too drunk to participate in the carjacking and that it was too light outside for Williams to continue with his plan to carjack someone, and that they should steal licenses plates to use on their rental car during the bank robbery, instead of carjacking someone.

(4)     Handelman's statements to her brother following the Aurora bank robbery while at her brother's house, including:

- Handelman's statement that she and Williams had robbed the Aurora bank;

- Handelman's statement that Williams had been arrested; and

- Handelman's statement that she had money from the bank robbery in her backpack.

10

(5)     Handelman's statements to Williams' uncle and Williams' uncle's daughter—who both assisted her in avoiding law enforcement following the Aurora bank robbery—including:

- Handelman's statements to Williams' uncle concerning the bank robberies;

- Handelman's statements to Williams' uncle concerning the bank robbery money that was in her possession; and

- Handelman's statements to Williams' uncle about Williams having been arrested.

## A.     Governing Law

Rule 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Admission of such co-conspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy exited; (2) Williams and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy.  *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[8]  Under *Santiago*, the trial court must preliminarily determine whether statements by a co-conspirator of the defendant will be admissible at trial under Rule 801(d)(2)(E).  In making this determination, the judge must decide "if it is more

---

[8] No Sixth Amendment confrontation issues are posed by the use of a non-testifying co-conspirator's statements, offered for their truth against a defendant, as such statements are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 US. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (co-conspirator statements are neither hearsay nor testimonial).

likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Santiago*, 582 F.2d at 1143 (internal quotations omitted); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If the court determines that the statements are admissible, the jury/court may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

### Existence of and Membership in Conspiracy

In making the initial admissibility determination under the *Santiago* criteria, a court can consider the statements in question (those to be admitted). *See Bourjaily*, 483 U.S. at 176-81. While a court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and a defendant's participation in it, the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. *See id.* at 178, 180; *see also United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009). Instead, there must also be some supporting evidence or facts corroborating the existence of the conspiracy and the defendant's participation in the conspiracy. *See Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and the defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-755 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).

There is no requirement, for admissibility under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy charge, such as a meeting of the

12

minds and an overt act. *United States v. Coe*, 781 F.2d 830, 835 (7th Cir. 1983). The government need only establish the existence of a joint venture for an illegal purpose and participation in the joint venture by the defendant and the maker of the statement at issue, as well as that the statement was in furtherance of the venture. "[I]t makes no difference whether the declarant or any other "partner in crime" could actually be tried, convicted and punished for the crime of conspiracy." *United States v. Gil*, 604 F.2d 546, 549-50; *see also Coe*, 718 F.2d at 835.

Although, as discussed above, there is a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every co-conspirator or schemer. *Longstreet*, 567 F.3d at 919; *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001).

Finally, the government is neither required to prove the identity of the declarant nor must the declarant's identity be confirmed in the statement itself.

*See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a co-conspirator. *Id.*

### The "In Furtherance" Requirement

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "co-conspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" to be admissible under the co-conspirator exception. *Id.* at 937 (quotations and citations omitted).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630, at *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

a. to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);

b. to identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

c. to plan or to review a co-conspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

d. as an assurance that a co-conspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

e. to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

f. to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

g. to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

h. to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

i. to report conspirators' status and in turn receive assurances of assistance from co-conspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

j. to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992); and

k. to attempt to recruit new members into the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all co-conspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 Fed. App'x 925,

926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### B. Evidence of the Existence of the Conspiracies and Williams', Handelman's, and Sweeney's Participation in the Conspiracies

As charged in the third superseding indictment, Williams participated in two conspiracies—one with Handelman and one with Sweeney. Williams both conspired with Sweeney to dispose of a firearm and ammunition to a convicted felon and conspired with Handelman to commit armed bank robbery. The government's evidence establishing these conspiracies is extensive. Among other things, the government anticipates presenting the following evidence at Williams' trial:

- Testimony from Handelman that she robbed the Old Second National Bank, the Norstates Bank, and the Aurora Bank & Trust with Williams in May 2018.

- Video surveillance from the robberies reflecting that: (a) a male and female duo—who were wearing face and head coverings, as well as gloves—robbed each bank; (2) the male robber carried an AK-47 style rifle in each robbery; (3) a blue Nissan Rogue was used by the robbers in the Gurnee bank robbery; (4) a black Ford Fusion was used by the robbers in the Aurora bank robbery; and (5) in addition to an AK-47 style rifle, the male robber also used a handgun, which he discharged, during the Aurora bank robbery.

- Testimony from an employee of a gun store called the Gun Doctor that: (a) Sweeney purchased an AK-47 style rifle on February 22, 2018, that she picked up from the store on February 24, 2018; (b) the AK-47 style rifle used in each of the robberies is consistent with the rifle Sweeney purchased; (c) when Sweeney

purchased the AK-47 style rifle, she was accompanied by an African American male, who the employee understood was her husband; and (d) the rifle Sweeney purchased used 7.62 x 39 ammunition.

- Records from Sweeney's bank and Walmart reflecting that Sweeney purchased 7.62 x 39 ammunition on May 1, 2018.

- Testimony from an employee of an auto-parts store—located down the street from the Ottawa bank—that, on May 11, 2018: (a) an African American male came into the auto-parts store and purchased two pairs of latex gloves; (b) a receipt from the purchase reflects that the transaction occurred approximately 11 minutes prior to the Ottawa bank robbery; (c) while inside the store, the man picked up a box of gloves that he later returned to the shelf; and (d) she recognizes the man inside the store that day as Williams.

- Testimony from an FBI fingerprint examiner that she recovered a latent fingerprint from the box of gloves in the auto-parts store, which she has identified as belonging to Williams.

- Images from Williams' cellular telephone depicting: (a) Williams holding an AK-47 style rifle on February 26, 2018 (two days after Sweeney picked the rifle up from the gun store); and (b) stacks of cash, some of which are wrapped in colored bank bands, on a table, taken approximately three and a half hours after the Ottawa bank robbery.

- Testimony from a bank teller at Old Second National Bank that, based on the numbering on the colored bank bands, she recognizes some of the stacks of

cash depicted in the image contained on Williams' phone as having come from one of her colleague's teller drawers.

- Testimony from an Enterprise Rent-A-Car employee that: (a) on May 15, 2018, Williams rented a blue Nissan Rogue, which he returned on May 22, 2018 (the day after the Norstates bank robbery); and (b) on May 22, 2018, Williams rented a black Ford Fusion, which he returned on May 31, 2018, several hours after the Aurora bank robbery.

- Testimony from an employee of a gun store called Gat Guns that: (a) Sweeney purchased two handguns, including a .45 caliber pistol, on May 22, 2018, paying approximately $800 in cash; and (b) Sweeney picked the two handguns up from the gun store on May 27, 2018, at which time she and Williams signed into a gun range connected to the gun store.

- Video surveillance from Gat Guns reflecting that Williams was with Sweeney at the time she purchased the two handguns on May 22, 2018.

- Testimony from law enforcement that: (a) a .45 caliber fired cartridge case was recovered from inside the bank following the Aurora bank robbery; (b) Williams was arrested on May 31, 2018 returning a black Ford Fusion to Enterprise Rent-A-Car; (c) at the time of Williams' arrest, he had approximately $8,900 in cash on him; (d) during a search of the hotel room where Williams was living, law enforcement recovered a gun case containing an envelope labeled with the serial number for the .45 caliber pistol Sweeney picked up from Gat Guns on May 27, 2018; and (e) the envelope contained a fired .45 caliber cartridge case.

- Testimony from an FBI physical scientist that the .45 caliber pistol purchased by Sweeney on May 22, 2018 fired both the .45 caliber cartridge case recovered from the Aurora bank following the robbery and the .45 caliber cartridge case recovered from Williams' hotel room.

- Records and video surveillance from TCF Bank reflecting that, following each bank robbery, Williams deposited large sums of cash into his bank account.

- Text messages from Williams' cellular telephone, including the May 1 and May 8, 2018 text message communications between Sweeney and Williams discussed above and the following text message communication:

<u>April 30, 2018</u>
9:37 p.m. – 9:44 p.m.

**Sweeney:** You put me out the car to go play with my toy [gun] ur bogus as hell. That bitch [Handelman] better not touch her!!!!!

**Williams:** MY TOY! And I'm not playing with shit! I'm loading up!

### C. Evidence of the "In Furtherance" Requirement

The statements discussed above were made in furtherance of the conspiracies. A statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). Such statements include ones that are made to: (1) inform and update others about the current status of the conspiracy, including failures, *Rea*, 621 F.3d at 605; (2) control damage to an ongoing conspiracy, *Johnson,* 200 F.3d at 533; (3) conceal a conspiracy

19

where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; (4) reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; (5) report conspirators' status and in turn receive assurances of assistance from co-conspirators, *Prieto*, 549 F.3d 513; and (6) review a co-conspirator's exploits, *Molt*, 772 F.2d at 369. "The statement need not have been made exclusively, or even primarily, to further the conspiracy. Rather, the record need only contain some reasonable basis for concluding that the statement in question furthered the conspiracy in some respect." *Johnson*, 200 F.3d at 533 (internal quotations and citations omitted).

Here, Sweeney engaged in communications with employees at the Gun Doctor—while accompanied by Williams—to acquire the AK-47 style rifle, which was later transferred to Williams. *See, e.g.*, *Cox*, 923 F.2d 519 at 527 (hearsay statements admissible where they furthered the goals/business of the conspiracy); *Johnson*, 200 F.3d at 533 (same). Sweeney's statements to Williams during their text message communications on May 1 and May 8, 2018 concerning the purchase of ammunition for the rifle and the acquisition of a smaller gun and directing Williams to the location of a firearm, likewise, furthered the goals of the conspiracy—transferring firearms and firearm ammunition to Williams, a convicted felon. *See, e.g.*, *Molt*, 772 F.2d at 368-69 (affirming admissibility of co-conspirator statements related to drug smuggling plans); *see also Rea*, 621 F.3d at 605 (affirming admissibility of co-conspirator statements that were made during ordinary information flow by and

20

among conspirators and served to inform members about the current status of the conspiracy).

Similarly, Handelman's statements to Williams concerning turning off their cellular telephones prior to the Ottawa bank robbery and seeking to dissuade Williams from stealing someone's car prior to the Gurnee bank robbery were also made for purposes of conducting the business of the conspiracy.[9] Indeed, the government anticipates that Handelman will testify that she suggested to Williams that they turn their cellular telephones off prior to the Ottawa bank robbery because she thought it would prevent them from being identified as the robbers. *See Gajo*, 290 F.3d at 928-29 (affirming admissibility of co-conspirator statements made for purposes of concealing conspiracy). Handelman's statements to her brother, Williams' uncle, and Williams' uncle's daughter, likewise, were made in an effort to conceal the conspiracy and protect the bank robbery proceeds as she fled from law enforcement following Williams' arrest. *See, e.g., Johnson*, 200 F.3d at 533; *Maloney*, 71 F.3d at 659-60.

---

[9] The Court previously ruled that evidence related to the attempted carjacking was admissible as direct evidence of the bank robbery conspiracy. (*See* Dkt. No. 91 at 8-13; *see* also Dkt. No. 110.)

### III. <u>CONCLUSION</u>

The government respectfully requests that this Court find, based upon this proffer, that Handelman's and Sweeney's co-conspirator statements, as outlined above, are admissible against Williams pending the introduction of evidence at trial to support this proffer.

Respectfully submitted,
JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Shy Jackson*
SHY JACKSON
SCOTT EDENFIELD
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-1317

Dated: July 21, 2020